IN THE DISTRICT COURT OF THE UNITED STATES
FOR THE MIDDLE DISTRICT OF ALABAMA
SOUTHERN DIVISION

DEBRA ELAINE WORTHINGTON,       )
                                )
         Plaintiff,             )
                                )
v.                              )        CASE NO. 1:13-cv-889-TFM
                                )        [wo]
CAROLYN W. COLVIN,              )
Acting Commissioner of Social Security,   )
                                )
         Defendant.             )

## MEMORANDUM OPINION AND ORDER

Debra Elaine Worthington ("Plaintiff" or "Worthington") applied for disability insurance benefits under Title II of the Social Security Act ("the Act"), 42 U.S.C. §§ 401 *et seq*. on January 13, 2011. R. 13. After being denied on April 5, 2011, Worthington timely filed for and received a hearing before an administrative law judge ("ALJ") who rendered an unfavorable decision on June 13, 2012. R. 13, 26. Worthington subsequently petitioned for review to the Appeals Council who rejected review of Worthington's case on October 11, 2013. R. 1. As a result, the ALJ's decision became the final decision of the Commissioner of Social Security ("Commissioner"). *Id.* Judicial review proceeds pursuant to 42 U.S.C. § 405(g), and 28 U.S.C. § 636(c). After careful scrutiny of the record and briefs, for reasons herein explained, the Court AFFIRMS the Commissioner's decision.

## I. NATURE OF THE CASE

Worthington seeks judicial review of the Commissioner's decision denying her application for disability insurance benefits.  United States District Courts may conduct limited review of such decisions to determine whether they comply with applicable law and are supported by substantial evidence.  42 U.S.C. § 405.  The court may affirm, reverse and remand with instructions, or reverse and render a judgment.  *Id*.

## II. STANDARD OF REVIEW

The Court's review of the Commissioner's decision is a limited one.  The Court's sole function is to determine whether the ALJ's opinion is supported by substantial evidence and whether the proper legal standards were applied.  *See Jones v. Apfel*, 190 F.3d 1224, 1228 (11th Cir. 1999); *Bloodsworth v. Heckler*, 703 F.2d 1233, 1239 (11th Cir. 1983).

"The Social Security Act mandates that 'findings of the Secretary as to any fact, if supported by substantial evidence, shall be conclusive.'"  *Foote v. Chater*, 67 F.3d 1553, 1560 (11th Cir. 1995) (quoting 42 U.S.C. §405(g)).  Thus, this Court must find the Commissioner's decision conclusive if it is supported by substantial evidence.  *Graham v. Apfel*, 129 F.3d 1420, 1422 (11th Cir. 1997).  Substantial evidence is more than a scintilla — i.e., the evidence must do more than merely create a suspicion of the existence of a fact, and must include such relevant evidence as a reasonable person would accept as adequate to support the conclusion.  *Lewis v. Callahan*, 125 F.3d 1436, 1440 (11th Cir. 1997) (citing *Richardson v. Perales*, 402 U.S. 389, 401, 91 S.Ct. 1420, 1427, 28 L.Ed.2d 842 (1971)); *Foote*, 67 F.3d at 1560 (citing *Walden v. Schweiker*, 672 F.2d

835, 838 (11th Cir. 1982)).

If the Commissioner's decision is supported by substantial evidence, the district court will affirm, even if the court would have reached a contrary result as finder of fact, and even if the evidence preponderates against the Commissioner's findings. *Ellison v. Barnhart*, 355 F.3d 1272, 1275 (11th Cir. 2003); *Edwards v. Sullivan*, 937 F.2d 580, 584 n.3 (11th Cir. 1991) (quoting *MacGregor v. Bowen*, 786 F.2d 1050, 1053 (11th Cir. 1986)). The Court must view the evidence as a whole, taking into account evidence favorable as well as unfavorable to the decision. *Foote*, 67 F.3d at 1560 (citing *Chester v. Bowen*, 792 F.2d 129, 131 (11th Cir. 1986). The Court "may not decide facts anew, reweigh the evidence, or substitute [its] judgment for that of the [Commissioner]," but rather it "must defer to the Commissioner's decision if it is supported by substantial evidence." *Miles v. Chater*, 84 F.3d 1397, 1400 (11th Cir. 1997) (quoting *Bloodsworth*, 703 F.2d at 1239).

The Court will also reverse a Commissioner's decision on plenary review if the decision applies incorrect law, or if the decision fails to provide the district court with sufficient reasoning to determine that the Commissioner properly applied the law. *Keeton v. Dep't of Health and Human Servs.*, 21 F.3d 1064, 1066 (11th Cir. 1994) (citing *Cornelius v. Sullivan*, 936 F.2d 1143, 1145 (11th Cir. 1991)). There is no presumption that the Commissioner's conclusions of law are valid. *Id.*; *Brown v. Sullivan*, 921 F.2d 1233, 1236 (11th Cir. 1991) (quoting *MacGregor*, 786 F.2d at 1053).

### III. STATUTORY AND REGULATORY FRAMEWORK

The Social Security Act's general disability insurance benefits program ("DIB")

provides income to individuals who are forced into involuntary, premature retirement, provided they are both insured and disabled, regardless of indigence.[1]  *See* 42 U.S.C. § 423(a).  The Social Security Act's Supplemental Security Income ("SSI") is a separate and distinct program.  SSI is a general public assistance measure providing an additional resource to the aged, blind, and disabled to assure that their income does not fall below the poverty line.[2]  Eligibility for SSI is based upon proof of indigence and disability.  *See* 42 U.S.C. §§ 1382(a), 1382c(a)(3)(A)-(C).  However, despite the fact they are separate programs, the law and regulations governing a claim for DIB and a claim for SSI are identical; therefore, claims for DIB and SSI are treated identically for the purpose of determining whether a claimant is disabled.  *Patterson v. Bowen*, 799 F.2d 1455, 1456 n. 1 (11th Cir. 1986).  Applicants under DIB and SSI must provide "disability" within the meaning of the Social Security Act which defines disability in virtually identical language for both programs.  *See* 42 U.S.C. §§ 423(d), 1382c(a)(3), 1382c(a)(3)(G); 20 C.F.R. §§ 404.1505(a), 416.905(a).  A person is entitled to disability benefits when the person is unable to

> Engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months.

---

[1] DIB is authorized by Title II of the Social Security Act, and is funded by Social Security taxes. *See* Social Security Administration, Social Security Handbook, § 136.1, *available at* http://www.ssa.gov/OP_Home/handbook/handbook.html

[2] SSI benefits are authorized by Title XVI of the Social Security Act and are funded by general tax revenues.  *See* Social Security Administration, Social Security Handbook, §§ 136.2, 2100, *available at* http://www.ssa.gov/OP_Home/handbook/handbook.html

42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A).  A "physical or mental impairment" is one resulting from anatomical, physiological, or psychological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques.  42 U.S.C. §§ 423(d)(3), 1382c(a)(3)(D).

The Commissioner of Social Security employs a five-step, sequential evaluation process to determine whether a claimant is entitled to benefits.  *See* 20 C.F.R. §§ 404.1520, 416.920 (2010).

(1) Is the person presently unemployed?

(2) Is the person's impairment(s) severe?

(3) Does the person's impairment(s) meet or equal one of the specific impairments set forth in 20 C.F.R. Pt. 404, Subpt. P, App. 1?[3]

(4) Is the person unable to perform his or her former occupation?

(5) Is the person unable to perform any other work within the economy?

An affirmative answer to any of the questions leads either to the next question, or, on steps three and five, to a finding of disability.  A negative answer to any question, other than step three, leads to a determination of "not disabled."

*McDaniel v. Bowen*, 800 F.2d 1026, 1030 (11th Cir. 1986).

The burden of proof rests on a claimant through Step 4.  *See Phillips v. Barnhart*, 357 F.3d 1232, 1237-39 (11th Cir. 2004).  Claimants establish a prima facie case of qualifying disability once they meet the burden of proof from Step 1 through Step 4.  At Step 5, the burden shifts to the Commissioner, who must then show there are a significant

---

[3] This subpart is also referred to as "the Listing of Impairments" or "the Listings."

number of jobs in the national economy the claimant can perform.  *Id*.

To perform the fourth and fifth steps, the ALJ must determine the claimant's Residual Functional Capacity ("RFC").  *Id*. at 1238-39.  RFC is what the claimant is still able to do despite his impairments and is based on all relevant medical and other evidence.  *Id*.  It also can contain both exertional and nonexertional limitations.  *Id*. at 1242-43.  At the fifth step, the ALJ considers the claimant's RFC, age, education, and work experience to determine if there are jobs available in the national economy the claimant can perform.  *Id*. at 1239.  To do this, the ALJ can either use the Medical Vocational Guidelines[4] ("grids") or hear testimony from a vocational expert ("VE").  *Id*. at 1239-40.

The grids allow the ALJ to consider factors such as age, confinement to sedentary or light work, inability to speak English, educational deficiencies, and lack of job experience.  Each factor can independently limit the number of jobs realistically available to an individual.  *Id.* at 1240.  Combinations of these factors yield a statutorily-required finding of "Disabled" or "Not Disabled."  *Id*.

### IV.  ADMINISTRATIVE FINDINGS AND CONCLUSIONS

Worthington, age 53 at the time of the hearing, has completed the General Educational Development degree ("G.E.D.") and at least one year of college, and is able to read and write.   R. 25, 33-34, 260.  Worthington has past relevant work as a receptionist (semi-skilled, sedentary), administrative assistant (skilled, sedentary), and secretary (skilled, sedentary).  R. 24, 47-48.  Worthington's alleged disability onset date

---

[4] *See* 20 C.F.R. pt. 404 subpt. P, app. 2; *see also* 20 C.F.R. § 416.969 (use of the grids in SSI cases).

is March 15, 2008.  R. 13.  Worthington has not engaged in substantial gainful work activity since her alleged disability onset date.  R. 15.  Worthington meets the insured status requirements of the Social Security Act through June 30, 2012.  *Id.*  Worthington claims she is unable to work because of back and right knee pain, seizures, bi-polar disorder, depression, and anxiety.

Worthington received treatment from various medical practitioners and the ALJ considered the medical records from these practitioners.  Worthington went to the Halifax Health Emergency Department in February of 2009 after being involved in a motor vehicle accident.  R. 187-91.  Worthington complained of a headache, nausea, slight dizziness, one episode of vomiting, and pain in her lower back where she has had chronic back problems.  R. 188.  A physical examination revealed no clubbing, cyanosis, edema or joint tenderness in her extremities.  R. 18, 190.  Worthington's back was tender in the low lumbar paravertebral areas, but without deformity or crepitance, and there was no flank tenderness.  *Id.*  X-rays of Worthington's lumbar spine revealed a slight degenerative change with no appreciable compression deformity, spondylolisthesis, or spondylitis.  R. 18, 192.  Worthington was diagnosed with cervical strain, and paralumbar strain, and was discharged in stable condition.  R. 191.

On August 11, 2009, Worthington went to Gulf Coast Mental Health Center on a referral seeking treatment for chronic depression and mood swings, bipolar disorder, obsessive compulsive disorder ("OCD") with "schizophrenic tendencies," and Post Traumatic Stress Disorder ("PTSD").  R. 256.  Worthington explained that she suffered a childhood trauma that contributes to her depression.  R. 259.  Additionally, when she was

ten years old, Worthington's father was killed in a car accident.  *Id.*  Worthington said she still blames herself for her father's death which has led to severe depression from the guilt.  *Id.*  Additionally, her mother died in a fire about twenty years ago while they were estranged, which she also feels guilt and depression over.  *Id.*  At the age of twenty, Worthington was diagnosed with PTSD that led to stress-induced seizures, which began at the age of ten.  *Id.*  However, she no longer experiences the seizures.  *Id.*  During Worthington's second marriage, she experienced physical and verbal abuse from her husband for several years until they got divorced.  *Id.*  Worthington stated that her depression is also exacerbated by marital difficulties due to her current husband's refusal to receive treatment for a serious medical condition.  *Id.*  Worthington said when she is experiences a bout of depression, she sits alone, "shuts down," and does not speak with anyone.  *Id.*

Worthington also said that she suffers from OCD with schizophrenic tendencies. R. 259.  The obsessive compulsive behavior causes Worthington to check locks, electronics, and appliances on a regular basis, including throughout the night which prevents her from sleeping through the night.  R. 256, 259.  Worthington also exhibits "germaphobic" tendencies when out in public.  R. 259.

The doctor noted that Worthington appears to be in good physical health.  *Id.* Worthington does not drink or do drugs, but she does smoke cigarettes.  R. 217, 259-260. Worthington said she believes her current medicine regime is controlling all of her symptoms.  R. 256.  The doctor also noted that Worthington said she is an "avid reader, loves to swim [and] lay on the beach, take walks on starry nights, Native American crafts,

crochets[, and is c]urrently 'writing a novel.'"   R. 260.   Worthington was diagnosed based on her history with OCD, bipolar I, and severe depression with psychotic features. *Id.*  The doctor prescribed refills for Paroxetine, Hydroxyzine Pamoate, and Diazepam. R. 261.   Worthington moved to Alabama prior to her next appointment at Gulf Coast Mental Health Center.

In  December  of  2010,  Worthington  began  seeing  Steven  Davis,  M.D.  ("Dr. Davis")  after  moving  to  Alabama  from  Florida.   R. 251.   Dr. Davis  indicated  he  will request Worthington's prior medical records, and refilled her prescriptions.  *Id.*  On June 7, 2011, Worthington saw Dr. Davis for the purpose of having him fill out a disability form for her attorney.  R. 250.  Dr. Davis asked Worthington several questions, noted that she "[a]nswers all questions well as we ask them," and then filled out the form.  R. 247-250.  Worthington returned on December 13, 2011 to have her prescriptions refilled.  R. 245.  Dr. Davis noted that Worthington is "doing quite well," "[s]he said she is not having any depression," she has had "[n]o bad mood swings whatsoever," and that her "[m]edications seem to be working quite well."  R. 245.

On March 8, 2011, Mark B. Ellis, D.O. ("Dr. Ellis") conducted a disability exam at Worthington's request.  R. 217-219.  Worthington said that she is unable to work due to  PTSD,  bipolar,  chronic  depression,  and  neck,  back,  and  knee  pain.   R. 217. Worthington said she is unable to sit or stand for more than fifteen minutes at a time, and is only able to walk a few blocks due to the pain.  *Id.*  Worthington reported her average pain to be four or five on a pain scale ranging from one to ten, but upon activity her pain rises to a seven.  *Id.*  Worthington said she has "pseudo-seizures," but she does not take

any anti-seizure medications.  *Id.*  Worthington said she is able to drive herself, do light housework, dress and care for herself, and does not use any assistance devices.  *Id.*  Upon examination Dr. Ellis found:

> Well-developed, well-nourished, obese white female in no apparent distress, cooperative, alert and oriented to person, place, and time.  The patient ambulates with a normal gait, which is not unsteady, lurching or unpredictable.  The patient does not require the use of an ambulatory aid.  The patient appears stable at station and comfortable in the supine and sitting positions.  Intellectual functioning appears to be normal during examination.  The patient is able to hear and understand conversational voices without difficulty.  Recent and remote memory for medical events is good.  The patient is able to follow simple commands and instructions without difficulty.

R. 218.  Dr. Ellis also found that Worthington's range of motion on flexion in her knees and ankles were normal bilaterally; extremities showed no signs of atrophy, wasting, or deformity; no clubbing, cyanosis, or edema; her grip strength was 5/5 in each hand; no muscle spasms; she was able to toe and heel walk, and squat, but with some lower back pain; no tenderness to palpation and movement of the lumbar spine, and no abnormal curvature of the spine, no spasms or deformity, and straight leg raise was negative bilaterally, but she complained of tenderness with palpation and movement of the lumbar spine.  R. 218-19.  Dr. Ellis found that Worthington's neurological findings were within normal ranges; no gross motor or sensory deficits; she was able to perform a normal finger to nose; Romberg was normal bilaterally; and she was able to handle, manipulate, and transfer objects from one hand to another.  R. 219.

On March 17, 2011, Worthington was referred to a consultative examination by Fred George, Ph.D. ("Dr. George").  R. 223.  Worthington described her mood to be

depressed, and her range of affect was restricted; however, her affect and was "stable and appropriate."  R. 224.  Worthington had proper hygiene and was appropriately dressed and groomed.  *Id.*  Dr. George found Worthington to be "alert and oriented to time, place, person, and situation."  *Id.*  Worthington's speech and conversation was within normal limits, but her activity level was "somewhat slowed."  *Id*.  Dr. George found that her attention and concentration was significantly impaired based on the results of the serial 7's test, but she was able to spell backwards.  *Id.*  Dr. George found Worthington's immediate and recent memory to be intact, but her remote memory appeared impaired.  *Id.*  Worthington's fund of information appeared below average.  R. 224.  Worthington's verbal conceptual thinking was in the average range, and her insight into her difficulties and judgment appeared intact with no "loose associations, tangential or circumstantial thinking hallucinations, delusions, or ideas of reference were observed.  *Id.*

Worthington reported daily activities of preparing meals, listening to music, reading, resting, sewing, watching television, working in the garden, doing light housework, and taking walks.  R. 225.  Worthington reported that she does not leave the house often except to buy food, pay bills, and go to appointments.  *Id.*  Worthington said she sees her children and other relatives on a regular basis.  *Id.*  Dr. George noted that Worthington's daily activities "appear to be significantly restricted and her interest and relationships significantly constricted."  *Id.*

Dr. George diagnosed Worthington with Axis I: bipolar disorder NOS, with psychotic features; prolonged post-traumatic stress disorder; anxiety disorder NOS, with features of generalized anxiety and panic disorder; Axis II: no diagnosis; Axis III:

"displaced kneecap resulting from an injury sustained in an automobile accident; back pain from degenerative discs; migraine, tension, and cluster headaches; weakness in both ankles and weakness in both wrists." *Id.* Dr. George ultimately found that Worthington has the ability "to live independently and mange her own funds;" has the "intellectual and memory ability to understand and remember skilled occupation in a wide range of service occupations," but that due to her mood disturbances and anxiety she would "be unable to relate to coworkers, supervisors and members of the general public and to cope with job stresses and job changes in the work environment." *Id.* Dr. George also recommended that Worthington be referred for a mental health evaluation and treatment with supportive psychotherapy/counseling. *Id.*

On April 4, 2011, Guendalina Ravello, Ph.D. ("Dr. Ravello"), a non-examining physician, reviewed Worthington's medical records and completed a Psychiatric Review Technique form. R. 226-242. Dr. Ravello opined that Worthington has no more than moderate limitations in her activities of daily living, maintaining social functioning, and maintaining concentration, persistence, or pace. R. 236. Similarly, Dr. Ravello opined that Worthington had no more than a moderate limitation in understanding and memory, sustained concentration and persistence, social interaction, and adaptation. R. 240-241. Dr. Ravello issued a Functional Capacity Assessment that states that Worthington can: "understand and remember simple instructions but will have more difficulty with detailed ones because of symptoms of anxiety, depression, and cognitive deficits;" "can carry out simple tasks, but not detailed ones;" "should be able to concentrate and attend to simple tasks for 2 hours and will need all customary rests and breaks;" "tolerate ordinary work

pressures but should avoid: excess workloads, quick decision making, rapid changes and multiple demands;" have casual contact with the public and co-workers, and feedback should be supportive, tactful, and non-confrontational; and handle gradual and infrequent changes in her work setting.  R. 242.

After review of the medical records, the ALJ found that Worthington has the following severe impairments: degenerative disc disease of the lumbar spine; right knee sprain from motor vehicle accident; history of pseudo-seizures; depression; bi-polar disorder; and anxiety.  R. 15.   The ALJ found that Worthington "has the residual functional capacity to perform less than the Full Range of medium work" with the exception of several limitations.   R. 17.   The ALJ then found that considering Worthington's "age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that [she] can perform." R. 25.

## V.  ISSUES

Worthington raises two issues for judicial review:

(1)     Whether the ALJ erred in forming his RFC assessment despite the record being devoid of any physical RFC assessments completed by a physician; and

(2)     Whether the ALJ's finding that Worthington is capable of performing the mental demands of unskilled level work is supported by substantial evidence.

*See* Doc. 12 at 3-4.

## VI.  DISCUSSION

**A.   The ALJ properly formed a RFC assessment without a physician's physical RFC assessment in the record.**

Worthington argues that "the Commissioner's decision should be reversed because the ALJ's RFC assessment is not supported by substantial evidence as the record is devoid of any physical RFC assessment from any physicians whatsoever."  *See* Doc. 12 at 4.  The Government responded that the "agency's regulations and rulings make it clear that it is the ALJ's responsibility to asses a claimant's residual functional capacity."  *See* Doc. 15 at 9.

"After careful consideration of the entire record," the ALJ found that:

> [T]he claimant has the residual functional capacity to perform less than the Full Range of medium work as defined in 20 C.F.R. § 404.1567(c).  The claimant is able to lift and carry 25 pounds frequently and 50 pounds occasionally; sit, stand and walk for a total of 6 hours each during an 8 hour workday; frequently use the upper and lower extremities to push and pull; frequently bend, balance, stoop, kneel, crouch, crawl and climb ramps and stairs; precluded from climbing ladders, ropes, and scaffolds; frequently reach overhead; continuously handle, finger and feel; precluded from exposure to extreme heat and cold; no work around unprotected heights, dangerous machinery, commercial driving or work around large bodies of water; able to perform simple routine tasks involving no more than simple, short instructions and simple work related decisions with few work place changes; occasionally interact with the general public; and able to sustain concentration and attention for 2 hours.

R. 17-18.  At this point in the five-step, sequential evaluation the burden is on the claimant to prove that she is disabled.  *Jones*, 190 F.3d at 1228 (citing 20 C.F.R. § 416.912 (1998)); *see also Moore v. Barnhart*, 405 F.3d 1208, 1211 (11th Cir. 2005).  "At the fourth step, the ALJ must assess: (1) the claimant's residual functional capacity ('RFC'); and (2) the claimant's ability to return to her past relevant work."  *Phillips*, 357

F.3d at 1238 (citing 20 C.F.R. § 404.1520(a)(4)(iv)).  To determine the claimant's RFC, the ALJ "must determine if the claimant is limited to a particular work level." *Id.*  To be deemed capable of performing sedentary work, the claimant must have the ability to "lift no more than 10 pounds at a time and occasionally lifting or carrying articles like docket files, ledgers, and small tools" and "walking and standing are required occasionally."  20 C.F.R § 404.1567(a).  "Although a claimant may provide a statement containing a physician's opinion of her remaining capabilities, the ALJ will evaluate such a statement in light of the other evidence presented and the ultimate determination of disability is reserved for the ALJ."  *Green v. Soc. Sec. Admin.*, 223 F. App'x 915, 923 (11th Cir. 2007) (citing 20 C.F.R §§ 404.1513, 404.1527, 404.1545).

In *Green*, the ALJ discredited the only physician RFC assessment that was in the record, and the plaintiff argued that the ALJ lacked substantial evidence to base his RFC assessment without a physician's RFC.  *Id.*  The Eleventh Circuit stated that even without considering a physician's RFC assessment, the record indicated that she was managing her impairments well, and her symptoms were controlled.  *Id.* at 923-24.  As a result, the Eleventh Circuit found that "substantial evidence supports the ALJ's determination that Green could perform light work."  *Id.* at 924.  Similarly, in *Griffin v. Astrue*, the plaintiff argued that a physician's RFC assessment was required.  2008 WL 4417228, *9 (S.D. Ala. Sept. 23, 2008).  The court found that despite not having a physician's RFC, the ALJ's RFC was "supported by the claimant's treating physicians, as well as the absence of functional limitations placed on the claimant by any medical source."  *Id.* at *10.  The court noted that "[w]hile Plaintiff asserts that a physician's RFC assessment was required,

she has not demonstrated that the ALJ did not have enough information to enable him to make a RFC determination, nor has she pointed to any medical evidence which suggests that the ALJ's RFC assessment is incorrect." *Id.* The court ultimately held that "substantial evidence supports the ALJ's determination that Plaintiff possesses the RFC to perform light work" because the medical records demonstrated that despite having severe impairments, her condition was stable and controlled with medication. *Id.* The court also found that the medical records did not reveal any evidence of functional limitations, and none of the plaintiff's physicians limited her activities. *Id.*

After review of the ALJ's opinion, it is clear to this Court that the ALJ carefully considered the medical evidence in the record when determining Worthington's RFC. The Court recognizes that the record lacks a physical RFC assessment completed by a physician. A RFC assessment is used to determine the claimant's capacity to do as much as they are possibly able to do despite their limitations. *See* 20 C.F.R. § 404.1545(a)(1) (2010). An RFC assessment will be made based on all relevant evidence in the case record. *Id.*; *Lewis*, 125 F.3d at 1440.

At a hearing before an ALJ, "the [ALJ] is responsible for assessing [the claimant's] residual functional capacity." 20 C.F.R. § 404.1546(c) (2010). The claimant is "responsible for providing the evidence [the ALJ] will use to make a finding about [the claimant's] residual functional capacity." 20 C.F.R. § 404.1545(a)(3) (2010). The ALJ is "responsible for developing [the claimant's] complete medical history, including arranging for a consultative examination(s) if necessary, and making every reasonable effort to help [the claimant] get medical reports from [their] own medical sources. *Id.;*

*Holladay v. Bowen,* 848 F.2d 1206, 1209-10 (11th Cir. 1988).  "The ALJ is not required to seek additional independent expert medical testimony before making a disability determination if the record is sufficient and additional expert testimony is not necessary for an informed decision."  *Nation v. Barnhart*, 153 F. App'x 597, 598 (11th Cir. 2005) (citing *Wilson v. Apfel*, 179 F.3d 1276, 1278 (11th Cir. 1999)); *see also Griffin*, 2008 WL 4417228, at *10 (citing 20 C.F.R. § 416.912(d)) ("The ALJ is bound to make every reasonable effort to obtain all the medical evidence necessary to make a determination [. . .]; however, he is not charged with making Plaintiff's case for her").  As previously stated, Worthington "has the burden of proving that [she] is disabled."  *Id.* (citing 20 C.F.R. § 416.912(a) and (c); *Hale v. Bowen*, 831 F.2d 1007, 1011 (11th Cir. 1987)).  The lack of a physician's RFC assessment in the record falls upon the claimant; the duty to obtain sufficient medical records to make a disability determination falls upon the ALJ.

Here, the ALJ found that Worthington suffers from the following severe impairments: degenerative disc disease of the lumbar spine; right knee sprain from motor vehicle accident; history of pseudo-seizures; depression; bi-polar disorder; and anxiety. R. 15.  However, the ALJ determined that

> [a]fter careful consideration of the evidence, the [ALJ] finds that the claimant's medically determinable impairments could reasonably be expected to cause the alleged symptoms; however, the claimant's statements concerning the intensity, persistence and limiting effects of these symptoms are not credible to the extent that they are inconsistent with the [RFC] assessment.

R. 20.  The ALJ found that he "longitudinal medical evidence does not support the severity of impairments or the presence of disabling impairments that would preclude

claimant from all work."  *Id.*  The ALJ took particular note of Worthington's medical records as recent as 2011 that were inconsistent with Worthington's allegation of total disability.

First, the ALJ gave significant weight to Dr. Ellis' consultative internal medicine examination conducted on March 8, 2011.  Upon examination Dr. Ellis found:

> Well-developed, well-nourished, obese white female in no apparent distress, cooperative, alert and oriented to person, place, and time.  The patient ambulates with a normal gait, which is not unsteady, lurching or unpredictable.  The patient does not require the use of an ambulatory aid.  The patient appears stable at station and comfortable in the supine and sitting positions.  Intellectual functioning appears to be normal during examination.  The patient is able to hear and understand conversational voices without difficulty.  Recent and remote memory for medical events is good.  The patient is able to follow simple commands and instructions without difficulty.

R. 218.  Dr. Ellis also found that Worthington's range of motion on flexion in her knees and ankles were normal bilaterally; extremities showed no signs of atrophy, wasting, or deformity; no clubbing, cyanosis, or edema; her grip strength was 5/5 in each hand; no muscle spasms; she was able to toe and heel walk, and squat, but with some lower back pain; no tenderness to palpation and movement of the lumbar spine, and no abnormal curvature of the spine, no spasms or deformity, and straight leg raise was negative bilaterally, but she complained of tenderness with palpation and movement of the lumbar spine.  R. 218-19.  Dr. Ellis found that Worthington's neurological findings were within normal ranges; no gross motor or sensory deficits; she was able to perform a normal finger to nose; Romberg was normal bilaterally; and she was able to handle, manipulate, and transfer objects from one hand to another.  R. 219.

The ALJ found that Dr. Ellis' normal findings are consistent with the "very minimal lumbar degenerative disc disease disclosed by radiology findings in February 2009, and claimant's own testimony that she merely treats her musculoskeletal pain with over-the-counter medication." R. 21. Worthington went to the Halifax Health Emergency Department in February of 2009 after being involved in a motor vehicle accident. R. 18, 187-91. Worthington complained of a headache, nausea, slight dizziness, one episode of vomiting, and pain in her lower back where she has had chronic back problems. R. 188. A physical examination revealed no clubbing, cyanosis, edema or joint tenderness in her extremities. R. 18, 190. Worthington's back was tender in the low lumbar paravertebral areas, but without deformity or crepitance, and there was no flank tenderness. *Id.* X-rays of Worthington's lumbar spine revealed a slight degenerative change with no appreciable compression deformity, spondylolisthesis, or spondylitis. R. 18, 192. Worthington was diagnosed with cervical strain, and paralumbar strain, and was discharged in stable condition. R. 191.

Next, the ALJ also accorded significant weight to Dr. Ravello's medical opinion after she reviewed Worthington's medical records and completed a Psychiatric Review Technique form of April 4, 2011. R. 226-242. Of relevance, Dr. Ravello opined that Worthington has no more than moderate limitations in her activities of daily living, maintaining social functioning, and maintaining concentration, persistence, or pace. R. 236. Similarly, Worthington requested Dr. Davis to complete a disability form in June of 2011. R. 23. Worthington did not report any physical limitations to Dr. Davis as a reason that she is disabled. *Id.* Instead, Worthington reported that she was disabled

because of her "bipolar disorder, concentration deficits, and problems getting along with others."  *Id.*

Next, the ALJ reviewed Worthington's subjective complaints throughout her medical history and at the hearing.  On August 11, 2009, Worthington was treated at Gulf Coast Mental Health Center.  R. 22.  The doctor noted that Worthington appears to be in good physical health.  *Id.*  Worthington does not drink or do drugs, but she does smoke cigarettes.  R. 217, 259-260.  Worthington said she believes her current medicine regime is controlling all of her symptoms.  R. 256.  The doctor also noted that Worthington said she is an "avid reader, loves to swim [and] lay on the beach, take walks on starry nights, Native American crafts, crochets[, and is c]urrently 'writing a novel.'"  R. 260.

At the hearing, Worthington testified that she had to stop working in March of 2008, her alleged onset date, "primarily due to concentration problems" and that her condition has continued to get worse.  *Id.*  The ALJ found that "the treatment notes from Gulf Coast Mental Health in August 2009, over a year after her alleged onset date indicate that the claimant felt her medications were controlling 'all' of her symptoms and her admitted concentration activities contradict her claims."  *Id.*  The ALJ also noted that Worthington testified to maintaining her driver's license and is able to drive, when she gets stressed she "gets lost in a book," and her typical day involves Bible study and morning devotionals, needle work (including sewing, crochet, embroidery, and other crafts), and watching television.  *Id.*  The ALJ held that "[t]hese admitted activities certainly do not suggest disabling deficits, and indicate that the claimant has no more than a moderate limitation in her concentration, persistence and pace."  *Id.*

The ALJ is responsible for determining Worthington's RFC, not a physician.  Had Worthington received an assessment by a physician, the ALJ would have been required to consider that assessment in making his determination.   "Even though Social Security courts are inquisitorial, not adversarial, in nature, claimants must establish that they are eligible for benefits.  The [ALJ] has a duty to develop the record where appropriate but is not required to order [additional evidence] as long as the record contains sufficient evidence for the [ALJ] to make an informed decision."  *Ingram v. Comm'r of Soc. Sec. Admin.,* 496 F.3d 1253, 1269 (11th Cir. 2007) (citing *Doughty v. Apfel*, 245 F.3d 1274, 1281 (11th Cir. 2001)).  It is clear to this Court that the ALJ carefully considered the medical evidence in the record in determining Worthington's physical and mental RFC, and the record contained sufficient evidence for the ALJ to make his decision.  Therefore, the Court finds that the ALJ's findings are supported by substantial evidence.

**B.   The ALJ's finding that Worthington is capable of performing the mental demands of unskilled level work is supported by substantial evidence.**

Next, Worthington argues that

[t]he record is devoid of any opinion from a physician regarding Ms. Worthington's physical limitations making it unclear how the ALJ determined Ms. Worthington would be capable of performing work at the medium level of exertion.  The only Physical Residual Functional Capacity Assessment on file is from the DDS and was completed by M. K. Fendley, who is a single decision-maker.  It is not clear how much weight the ALJ afforded the single decision-maker's assessment in Ms. Worthington's case, as she failed to mention or make reference to this assessment in her decision.

*See* Doc. 12 at 6.  On April 5, 2001, M. K. Fendley, a Single Decision-Maker ("SDM"), completed a Physical RFC Form.  R. 57-64.  Worthington avers that "the ALJ's ultimate

residual functional capacity finding was substantially similar to the same one offered by Ms. Fendley [. . .] [and b]ased on the striking similarity between the ALJ's RFC and the assessment completed by Ms. Fendley certainly raises the question of how heavily the ALJ relied upon Ms. Fendley's assessment in making her residual functional capacity finding." *See* Doc. 12 at 6-7.  As noted by Worthington, SDM forms are "entitled to no weight or consideration whatsoever." *See* Doc. 12 at 7.  However, Worthington's argument fails because, as Worthington admits, there is no evidence that the ALJ reviewed or considered the SDM form.  The ALJ never mentions the SDM form, nor does she mention Ms. Fendley.  The ALJ's opinion is entirely devoid of any mention or reference of the SDM form.  Worthington argues that the ALJ's RFC determination is "substantially similar" to the SDM form; however, there is absolutely no evidence in the record to support the claim that the ALJ based her findings on the SDM form.  Therefore, this Court finds that Worthington's argument is completely without merit.

## VII.  CONCLUSION

Pursuant to the findings and conclusions detailed in this Memorandum Opinion, the Court concludes that the ALJ's non-disability determination is supported by substantial evidence and proper application of the law.  It is, therefore, **ORDERED** that the decision of the Commissioner is **AFFIRMED.**  A separate judgment is entered herewith.

DONE this 16th day of July, 2015.

/s/ Terry F. Moorer
TERRY F. MOORER
UNITED STATES MAGISTRATE JUDGE